Sedgwick, J.
There is no question of the right of the plaintiffs to recover in this case, provided the defendants fail in their defence The interest of the plaintiffs and the loss by capture, as alleged, were admitted at the trial. The defendants produced a sentence or decree of the Court of Vice-Admiralty at Gibraltar, declaring the brigantine and cargo insured to be subject and liable to confiscation for a breach of the blockade of Cadiz, by egress, and for other sufficient reasons, and condemning the same as good and lawful prize.
There is no doubt that if, during the voyage insured, the captair *230 attempted a breach of a legal blockade, he thereby incurred a for feiture of the vessel and cargo; and if the loss sustained was occa' sioned thereby, that the underwriters are discharged.
The defendants, at the trial, insisted that the decree was conc?\tsive evidence of a breach of blockade; but the judge admitted other evidence, and on the whole the jury found that there was not a breach of blockade. If the decree ought to have been considered as conclusive evidence, then the other evidence was improperly admitted, and there ought to be a new trial.
The condemnation, as expressed by the sentence, is for the breach of blockade, and “ for other sufficient reasons.” Is this to be considered as a condemnation for a breach of blockade ? The judge, in his sentence, declares the brigantine to have broken the blockade by egress, after the public notification thereof, and during its notorious existence de facto; and he thereupon pronounced the brigantine, &c., thereby, and “for other sufficient reasons,” to have become subject and liable to confiscation ; and he [ * 281 ] * condemned the same, accordingly, as good and lawful prize. What those other sufficient reasons were, is not expressed in the sentence. I consider those words as merely surplus-age, and as having no operative meaning or effect; that the decree, therefore, is to be understood as a sentence of condemnation for a breach of blockade.
This brings us to the great question in this case, viz., whether a sentence of a foreign Court of Admiralty, (which has not been eversed,) as to that which is clearly expressed in it, is conclusive evidence against the plaintiffs; so that it cannot be.controverted by them in a suit upon the policy of insurance.
This is certainly a question of great importance. It is a question relative to which great learning and great talents have been divided ; and great and enlightened nations have adopted different rules; England, considering foreign sentences as conclusive, while France holds them evidence to be weighed and compared with such other evidence as may be adduced. After all, however, it is less important, perhaps, what the rule is, than that it should be established and known. If foreign sentences are to be received as conclusive against the assured, the premium of insurance will in reason, and I presume in fact also, be less ; if they are not conclusive, but may be contested by the assured, the premium will of course be greater.
When a ship is captured, at a distance from home, by a belligerent, for a breach of neutral duties, she must, from the nature of the thing, be tried in the court of the captor ; and the business of defending her devolves on the confidential agents of the insured the captain or supercargo, or both. The captain, it is true, is con *231 sidered as the general agent of all concerned, and bound to act for their interest. Still, however, his feelings, from the nature of his relation to the assured, and from his dependence upon him, will dictate a stronger sympathy with his interest, than with that of the insurer. If, then, a condemnation for a breach of neutral duties will necessarily fall upon the insured, *and dis- [*282] charge the underwriter conclusively from indemnifying for the loss sustained thereby, such a state of things will afford every possible motive to exertion to procure a favorable sentence.
On the contrary, a state of things may be supposed, in which it would be beneficial to the assured, that a condemnation should take place. If, for instance, there be a warranty of neutrality, and the ship be taken by a belligerent, as the property of his enemy, — upon a trial of the claim by the captain, from the state of the markets, or from other causes which may be supposed, it may be his wish that a condemnation should be had. The motives to remissness, or even to more culpable conduct, may be such as would not in all instances be resisted. Admit that, if his conduct is so gross as to afford positive evidence of fraud, or so negligent as to imply it, it will be a sufficient defence for the insurer against the loss by the condemnation, if it can be proved ; yet, in many cases, the facts in a distant country may never be intimated to the underwriter, and even where they should be suggested, it might be impossible to procure proof of them. A door against every such mischief and fraud will be effectually closed, provided a sentence of condemnation, in such cases, is holden to be conclusive against the insured.
Besides, the evidence of the neutral character of the ship, and of her conduct, to repel a charge of a breach of neutral duties, is most in the power, and can be most easily produced by those who have the charge of her, and by whom, on her being libelled, the claim must be made. And wherever the claimant is dissatisfied with a decree of an inferior Court of Admiralty, it is in his power to procure a revision of his cause by the superior tribunal of the nation of the captor.
From these considerations, it is evident to me that it will be most beneficial to neutral commerce, and most for the interest of neutral nations, that the loss sustained by foreign sentences of condemnation, in such cases as that * under consideration, [ * 283 ] should fall upon the insured. I think, for the reasons which I have mentioned, that condemnations will be more resolutely contended against, and that they will, in all probability, be less numerous. If the insurance be upon foreign neutral trade, it is manifest that the rule will be most beneficial to us, because it will be a security to the assurers, who are our citizens. If both the *232 insurer and insured belong here, it is then only a question of loss between them ; and such a rule, consistent with justice, should be established, as will reduce that loss as much as possible; and that, as I have suggested, is to throw it, in all cases, upon the assured.
It seems to me that it must be understood, as the meaning of the contract under consideration, that the underwriter did not, by it, assume the risk of an unjust or mistaken foreign sentence of condemnation, but that it remained with the insured. Undoubtedly it was competent to the parties to have formed such a contract as would render the insurer in such case liable; but it would, to my mind, have been an irrational one. Suppose that, at the time of the contract, the probability of what has happened had been in the consideration of the parties, and the plaintiffs had said to the defendants, “ Should we, in the prosecution of this voyage, be captured for a breach of blockade, of which we were not guilty, will you insure us against the loss ? ” The substance of the answer which prudence would have dictated, would have been, “ The event which you suppose is not to be expected ; but should it happen, you, who, by your agents, will be on the spot, can, with a greater probability of success, defend your property against an unjust prosecution, and prove your innocence, by the evidence within your power, than we, at a distance, without evidence, and probably ignorant of what is going forward until too late to make a defence.”
I will suppose another case, — that the plaintiffs had applied to the defendants to insure two ships on the same voyage, [ * 284 ] * the one belonging to a belligerent nation, and the other American. There is no doubt that the premiums would have been different. The ship insured as American is warranted to be neutral, and if she is not, or shall violate any neutral duties, or shall omit to perform any obligations, which her neutral character imposes, and a loss, for either of these causes, should accrue, the underwriter would be discharged. Should she be taken and condemned as enemies’ property, and the sentence, with a demand of payment, should be presented to the insurers, they would very properly observe, that had the loss, which had happened, been of the ship belonging to the belligerent nation, they should have been bound to pay, because they had received a premium for the risk, and had assumed it; but that, in this case, the sentence, by which the loss was proved, showed that it had happened by means for which they did not undertake to indemnify. If to this it had been replied by the insured, that the ship condemned as enemies’ property was, in fact, what she was warranted to be, — American, — and that the sentence was unjust,- — he would have been answered, and to my mind satisfactorily, that he was a *233 party to the sentence of which he complained, and that it was incomparably more reasonable that he should be concluded by it, than that it should be left open, to admit evidence against a solemn judgment of court.
It has been said that the assured ought not to be concluded by a foreign sentence, because the Court of Admiralty must be supposed to be partial to the nation to which they belong, and for whose benefit they decree condemnation.
To this I answer, in the first place, that such partiality is not t® be presumed by one court, in the conduct of another. We feel, I hope, that no consideration could seduce us to partiality in the ad ministration of justice. We expect that credit will be given tc this declaration ; and the same respect which we exact for ourselves, we feel disposed to reciprocate. Again, it is to be observed that it is * inevitable that the courts of a belliger- [ * 285 ] ent must decide on questions of this nature ; and that, as to the direct effect of their decisions, their jurisdiction is exclusive ; and also that, as to the means by which they come to the result, they employ other process and evidence, than are practised or known in the courts of common law, and from the nature of the subject it is necessary that they should. When, then, an insurance is made upon property warranted neutral, it appears to me reasonable to believe the meaning of the parties to the contract to be, that the insured shall be holden to prove the truth of the facts which he affirms, in the courts by which he knows they must be decided.
And this construction of the meaning of the parties appears the more reasonable, when it is considered that the amount of the premium received by the insurer depends upon the facts warranted to exist. The same observations may be applied to the contract under consideration, and others depending on the same principles. The insurer is a stranger to the whole transaction. He is absent, and, even if present, has no means of making a substantial defence. He is not in possession of the proofs, nor has he the means of procuring the necessary evidence. On the contrary, the insured is present by himself or his agents, has a perfect knowledge of all the circumstances, and is in possession of all the proofs. The prosecution charges either the falsehood of the declarations of the assured, or his illegal acts, or those of his agents, which must be considered as his own, as a ground for condemnation. Under these circumstances, if the prosecution succeeds, is it not more reasonable that the loss should, at all events, fall upon the insured, than that, in any event, it should be thrown upon the underwriter?
It is true that palpable and outrageous injustice may be done, *234 and immense losses sustained by the unjust sentences of foreign tribunals. In such cases, a redress of the injury must be sought by an application to another department of the government, [ * ¿86 ] which alone is capable of affording the * proper remedy.
But in the mean time, what propriety is there in shifting the loss from the insured, on whom, in my opinion, it properly falls, to the insurer, who has not made himself, by any express stipulation, responsible for it ? The sentence binds the insured directly, and why should it not also collaterally ?
Thus far have I been disposed to consider this case upon principle, and as res integra; but I think it is also decided conclusively by authority. This proposition I think to be universally true,— that a person in all cases is concluded by a decree, sentence, or judgment, of a court of competent and exclusive jurisdiction, in a suit in which he was a party, in all future trials of the same question; and whether that question arises directly or collaterally, provided there be no contract between the parties to the contrary; and that it is indifferent, whether the court making such decree, sentence, or judgment, be foreign or domestic. It is conclusive not only of the right, which it establishes, but of the fact, which it directly decides. This was, I think, established and well known as a principle of English law, at and long previous to the revolution.
I make no observations on a distinction between courts of peculiar, or exclusive, or.concurrent jurisdiction ; nor is it necessary. ] f the proposition I have laid down be true, it is decisive of the question before us. And I have always thought, that to render a subject as simple as possible, consistently with its complete consideration, and to strip it of all unnecessary complication, was favor able to the discovery of truth.
In the general proposition I have laid down, I have made the conclusiveness of the sentence to depend on there being no contract between the parties to the contrary. This leaves out of the present inquiry, whether, if, by the contract before us, the parties had agreed that a sentence of condemnation should not be conclusive evidence that the facts stated therein were true, such sentence would be binding in an action on the policy. It will also be [ * 287 ] understood * that, by the position taken, it is not intend ed to be affirmed, that such a sentence might not be avoided by a proof of fraud or collusion in obtaining it. Nor do I mean to include the case of an action brought in our courts, to enforce a foreign judgment.
With these observations, I proceed to a consideration of the proposition, which, if proved, must decide the case. It is, with the qualifications and exceptions already mentioned,— Thai in all cases *235 a person is concluded by a decree, sentence, or judgment, of a court, either foreign or domestic, of competent and exclusive jurisdiction, in all future trials of the same question; and whether that question arises directly or collaterally.
I shall first consider this proposition in relation to domestic judgments ; and I shall notice several cases, in which the principle, on various and distinct subjects, has been established or recognized; and I shall then show, from authority, that the same principle governs in relation to foreign judgments.
First, in ecclesiastical cases.
In the case of Prudham vs. Phillips, (8) it was determined that a party to a suit was bound by the sentence, in relation to all other persons; and that it is always sufficient, if the one against whom a sentence is offered was a party. In that case, it was indeed holden, that he who was a party to the suit could not be permitted to aver and prove fraud in obtaining the sentence. This case fully supports the principle I have laid down ; and more, that if there was fraud, the party injured by it must apply to the court, which pronounced the sentence, to vacate the judgment.
In the case of Baker vs. Rogers, (9) a prohibition to the Ecclesiastical Court was refused, because, among other reasons, the Ecclesiastical Courts had jurisdiction; and the court could not take cognizance whether their proceedings were lawful or not; and this although the consequence of the ecclesiastical decision was, that the plaintiff was deprived of his freehold.
* In the case of Biddulph vs. Ather, (10) it was ad- [ * 288 ] mitted that a sentence in an Ecclesiastical Court, in a matter whereof they have the sole cognizance, is conclusive evidence.
In the case of Bunting vs. Lepingwell, (11) Lord Coke says, “ Forasmuch as the cognizance of the right of marriage belongs to the Ecclesiastical Court, and the same court have given sentence in this case, the judges of our law ought (although it be against the reason of our law) to give faith and credit to their proceedings and sentences, and to think that their proceedings are consonant to the law of holy church, for cuilibet in suá arte perito. credendum est.. and so have the judges of our law always done.”
In the case of Da Costa vs. Villa Real, (12) which was an action on a contract of marriage, per verba de futuro, on the general issue pleaded, the defendant offered in evidence a sentence of the spiritual court in a cause of contract, where the judge had pro *236 nounced against the suit for a solemnization in the face of the church, and declared the defendant free from all contract. The chief justice held this to be proper and conclusive evidence on non assumpsit. It was a cause within their jurisdiction. Although the contract was per verba de futuro, and although the suit there is diverso intuitu, being for a specific performance, as far as admonition will go, and this being for damages, yet contract or no contract was the point in issue.
There are several other cases to the same purpose, unnecessary to be particularly stated. (13) The rule, which seems justly to be inferred from all these cases, is, that where any matter belongs so peculiarly to the jurisdiction of one court, that other courts can only take cognizance of the same subject indirectly and incidentally, the latter are bound by the sentence of the former, and must give credit to it. (14)
On the other hand, if the parties to a suit in a temporal court go to issue on any other matter than the lawfulness [ * 289 J * of the marriage, and on the trial of such issue, a marriage becomes essential to the title of either party, the lawfulness of the marriage is as much a subject of the trial, as any incidental fact, of a kind merely temporal, material to the issue. Yet, though the temporal courts may thus incidentally try the lawfulness of a marriage, when it is complicated with, and comprehended within, some other issue, still, if a sentence of an Ecclesiastical Court is offered in proof or disproof of the marriage, the peculiar jurisdiction of the latter is so attended to by the former, that it will not suffer any point asserted by the sentence to be controverted. This is evident from the authorities before referred to, and I believe none can be found to the contrary.
It is true that, in the case of The King vs. The Duchess of Kingston, (15) it was determined that a sentence against a marriage, in a suit for jactitation of marriage, is not conclusive evidence to prevent proving the same marriage in the trial of an indictment for polygamy ; and also that such sentence may be impeached for having been obtained by fraud. The latter part of that determination is not pertinent to the present inquiry.
That was a trial before the house of lords, on an indictment for polygamy.
The defendant had been first married to Mr. Hervey, and after wards, during his life, to the duke of Kingston. After she had pleaded not guilty, she offered to the court a sentence of the Con *237 sistory Court of the bishop of London, in a suit of jactitation of marriage, instituted by her against Mr. Hervey, that she was free from all matrimonial contracts or espousals with him; and it was insisted that it was conclusive, and that no other evidence ought to be received respecting it.
This case, when rightly considered, does not impugn the general proposition which I have laid down, but tends to its support. The sentence was pronounced in a suit instituted not against, but by, the defendant; and it was not against her, but in her favor; and on the trial produced by # her. The perni- [ * 290 ] clous consequences of concluding a criminal prosecution by such a sentence, so procured, must be obvious.
After the subject had been most elaborately discussed, the court directed these questions to be put to the judges: —
1. Whether a sentence of the spiritual court, against a marriage, in a suit of jactitation of marriage, is conclusive evidence, so as to estop the counsel for the crown from proving the same marriage, in an indictment for polygamy.
2. Whether, admitting such sentence to be conclusive upon such indictment, the counsel for the crown may be admitted to avoid the effect of such sentence, by proving the same to have been obtained by fraud or collusion.
The judges decided both of these questions unanimously against the defendant. Yet the court admits that such sentences are always conclusive evidence in civil suits, when produced against the parties to them ; but that, although the law stands thus with regard to civil suits, proceedings in matters of crime, and especially of felony, fall under a different consideration ; first, because the parties are not the same ; and, secondly, such doctrine would tend to give the spiritual courts, which are not permitted to exercise any jurisdiction in matters of crime, an immediate influence in trials for offences, and to draw the decision from the common law, to which it solely and peculiarly belongs. This famous case, then, admits the doctrine which must govern our present decision.
'As the Ecclesiastical Courts have in England exclusive jurisdiction relative to the probate of wills, it is hence, and for that reason, determined there, that all acts done in the exercise of that jurisdiction are binding and conclusive on the temporal courts. This •'point is established by the whole current of authorities upon the subject. (16)
The causes for depriving clergymen of their benefices generally *238 form another branch of the peculiar and exclusive jurisdiction of the spiritual courts in England; and hence the sen- [ * 291 ] tences of those courts, in this regard, have * been determined to be so conclusive, that the temporal courts cannot examine what is decided by the ecclesiastical judges. It is determined that, in these cases, if the spiritual court deprives a man, by sentence, in a case where they have jurisdiction, the cause of it can never come in question in any temporal court, in assize or otherwise, so long as it remains in force; but the temporal courts are bound by it. (17)
So, again, the Courts of Exchequer, and the commissioners of excise, having a peculiar jurisdiction for the condemnation of forfeited good.:, the determinations of both are conclusive evidence in actions brought to try the property of the same goods in other courts. (18)
Thus, in all the instances which have been mentioned, (and others might have been added,) there is a concurrence of authority, that the sentences of courts oí peculiar or exclusive jurisdiction (and it is unnecessary, in this case, to inquire what is the effect of the determinations of courts of concurrent jurisdiction) are conclusive against those who were parties to them, as well collaterally as directly.
It has been endeavored already to prove that, from ‘the principle of comity, the same respect is due to the sentence^ of foreign courts, on subjects within their exclusive jurisdiction, as to domestic sentences; and that they should produce the same effects. It would follow, of course, were there no authority for that purpose, and were the question now for the first time agitated, that\the principle should extend to, and comprehend, the sentences of foreign courts on questions of prize. X
That the extending of this principle of comity to the sentences of foreign courts does not, however, rest on reasoning only, appears from the case of Hughes vs. Cornelius, (19) by which it is evident that, in point of conclusiveness, foreign sentences have the same effect as domestic; and that the only remedy, where one is tag-grieved by them, is by an application to his own government. \ln the case of Beak vs. Thyrwhit, (20) the same doctrine is admitted.
In the case of Phillips vs. Hunter, (21) Lord Chief Ju\s- [ ■* 292 ] tice * Eyre says, “ It is one way only that the sentence or judgment of the court of a foreign state is examinable *239 in our courts; and that is, when the party who claims the benefit of it applies to our courts to enforce it.” — “ In all other cases, we give entire faith and credit to the sentences of foreign courts, and. consider them as conclusive upon us.” Also in the case of Newland vs. Horseman, (22) the lord chancellor, speaking of the sentence of a foreign Court of Admiralty, declared that he “ would not slight their proceedings beyond sea; and if, in this case, the damages had been there ascertained, or a peremptory sentence given, the same should have been concluding to all parties.”
By these cases, and others which might be mentioned, (23) it clearly appears, that it has been long understood in England, that foreign sentences, except in the single instance mentioned by Eyre, C. J., have the same effect as domestic judgments. This principle, then, is as well established, and understood to be so, as any other principle of the law. And not only has the principle been clearly established, and well understood, but in practice it has also been extended to the very subject under consideration.
The first reported case, by which the conclusiveness of foreign sentences of Courts of Admiralty was determined, was that of Hughes vs. Cornelius, already mentioned for a different purpose By a special verdict, a sentence of an Admiralty Court in France, condemning the property, was found in favor of the defendant. This, it is true, was an action of trover, and of consequence the only question directly before the court was the operation of the sentence upon the property. But the principle is laid down in the broadest terms ; and in the like terms foreign sentences are compared with the sentences of the Court of Exchequer. Nor is it in my power to conceive a reason why they should not, in all respects, as well collaterally as directly, have the same effect.
* Lord Holt, in the case of Green vs. Waler, (24) and [ * 293 ] in Ewer vs. Jones, (25) mentions this case of Hughes vs. Cornelius as an authority, although he had been of counsel for the plaintiff, and although the sentence, as be said, was an unjust one.
Lord Chief Baron Comyns (26) speaks of the sentences of foreign Courts of Admiralty as conclusive upon the parties ; and Professor Wooddeson, in his Vinerian Lectures, (27) says, “ When a definitive sentence is pronounced, by a competent Court of Admiralty, other nations, whose subjects may happen to be interested, ought to acquiesce. To examine the ground of such sentence is to attack the jurisdiction from which it issued.”
*240 It would be strange, indeed, if these profound lawyers had understood that foreign sentences were not as extensively conclusive as domestic sentences, that there should be no intimation of a distinction in this respect between them ; and in what restrained sense foreign sentences are conclusive. We have, however, the opinion of another celebrated lawyer, Judge Butter, extending the principle of the conclusiveness of sentences of foreign Courts of Admiralty to the very case now under consideration, (28) that of insurance. It was an action upon a policy of insurance, with a warranty that the ship was Swedish. The sentence of a French Admiralty Court, condemning the ship as English property, was holden to be conclusive. The same case was previously stated in “ The Theory of Evidence,” (29) a book published in 1761.
The case of Fernandes vs. Be Costa (30) was tried before Lord Mansfield, in the year 1764. The ship insured was warranted Portuguese. To prove that she was not Portuguese, the defendants produced a copy of the sentence of condemnation, by which the ship was adjudged not to be Portuguese, but without the libel. He also produced an answer of the plaintiff in the English Court of Chancery, admitting that the ship was condemned as not being, or under pretence of not being, Portuguese. The language [ * 294 J of * Lord Mansfield, as reported by Mr. Park, is this : “ As the sentence is always general, (without expressing the reason of the condemnation,) attested copies of the libel ought, in strictness, to have been produced, to show upon what ground the ship was libelled against. But as the plaintiff has, by his answer in chancery, admitted that she was condemned as not being Portuguese, when added to the expression used in the sentence of condemnation, that the ship was condemned in the court of prizes, there is sufficient evidence for us to proceed upon.”
It is very remarkable, that although the decision of the case of Fernandes vs. Be Costa depended upon the question of the conclu siveness of foreign sentences, yet that question was not at all agitated in the trial. Their conclusiveness was taken for granted. From hence it is impossible not to infer, and, to my mind, with perfect satisfaction, that the principle was then understood to be ultimately decided and well known.
From what has been said, to me it appears evident, that before the revolution the principle was established in England, by a long and uninterrupted course of decisions, and applied to a great variety of subjects, that sentences of a court of exclusive jurisdiction are conclusive against all who were parties to them, as. well collat *241 erally as directly; that this was equally true, whether the court was foreign or domestic; and that this principle had been applied., as comprehending the very question now under consideration.
If, in any case, the courts of this country are bound to receive a long and uninterrupted course of decisions of the English courts as evidence of the law, it is peculiarly proper that they should be so considered in questions relative to commerce; because, in our colonial situation, the absolute commercial supremacy of the mother country was admitted; and therefore a uniformity of decisions on commercial questions was indispensable to prevent confusion.
* Hitherto I have mentioned only the decisions of the [ * 295 ] English courts before the revolution ; but I do not think that their determinations since are wholly unimportant. Consider ing the distinguished character of the judges of those courts, when composed of different men, and that they at all times unanimously concur, the evidence is not to be slighted. It could hardly fail, on any subject, to produce a decisive influence on my judgment.
The case of Bernardi vs. Motteux (31) was upon an insurance of freight and goods, “ warranted neutral ship and neutral property.” The plaintiff offered to give evidence, on the trial, that the ship and property were neutral. The defendant objected to such evidence being received, and, as the ground of his objection, produced the sentence of condemnation in the French Admiralty Court. The question was, whether the sentence was conclusive evidence. The case was argued by very able counsel — Mr. Wood and Mr Dunning for the plaintiff. They admitted that, if the sentence had proceeded expressly on the ground of the property not being neutral, the plaintiff would be bound by it; but they insisted that the sentence was ambiguous, and therefore that the plaintiff was not concluded. Lord Mansfield declared that the sentence, as to that which is within it, is conclusive against all persons, unless reversed by the regular Court of Appeal. In addition to the express declaration of the court, were further satisfaction requisite, would it not be afforded by the express admission of such counsel as Dunning and Wood, that the principle was too well known, and too firmly established to be contended against?
Both Park and Marshall lay it down, as a clear and indisputable rule, that if it has been adjudged that the ship or goods insured were enemy’s property, — and this appears on the face of the sentence,— it is conclusive evidence to falsify a warranty of neutrality The principle of the conclusiveness of sentences of foreign Courts of *242 Admiralty has been admitted by all the judges, without [ * 296 ] a suggestion from * any one to the contrary ; and Lord Kenyon (32) says it has been acknowledged ever since it was so ruled in the case of Hughes vs. Cornelius. A great number of cases have been governed, and immense property settled, by it. (33) In all these cases, there has been no diversity of opinion that those sentences were conclusive evidence, not merely in suits between the identical parties, but for collateral purposes also; that, in actions brought on policies of insurance, they were conclusive against the assured. If all this does not furnish satisfactory evidence what the law is upon the question, and that it was settled and known previous to the revolution, it is impossible for me to conceive what would.
And what adds to the evidence that the rule was established and known is, that it was generally admitted as such, both by eminent counsel and learned judges, without discussion or argument.
In the late case of Lothian vs. Henderson, in the house of lords, (34) all the judges, in an action upon a policy of insurance, held that the sentence of a foreign Court of Admiralty is conclusive evidence of what appears upon the face of it, provided there is no agreement of the parties that it should not be so.
I will now proceed to consider how this question stands, in point of authority, in the United States. The question is now for the first time presented to this Court; but it has been discussed in the courts of several of the other states.
In the state of Connecticut, in the case of Warner vs. Stuart, (35) it was determined that the sentence of a foreign Court of Admiralty is conclusive evidence, and cannot be impeached in this country, until regularly set aside in the country where it was pronounced. Indeed, the judgment, in that case, went farther than I should be disposed to go; for it determined that such sentence could not be avoided on account of fraud practised in obtaining it. It is just, also, to observe that the case was an action of trover, and therefore that the opinion, in reference to the [ * 297 ] * subject-matter of it, does not go beyond that declared in the case of Hughes vs. Cornelius — that the proceeding, being in rem, was conclusive as evidence of property. It ought, *243 however, to be observed that the principle is laid down in the most unqualified terms, and without any intimation of a distinction, by which it is to be restrained, in its application, to the very case then under consideration.
The same principle was afterwards determined in the case of Bush vs. Sheldon. (36) It was indeed in relation to a decree of a Court of Probate — a domestic court. But it has, I think, been already proved that there is no distinction, as to the effects of their sentences, between foreign and domestic courts; the whole question being, in this regard, as to the nature of their jurisdiction.
It is true that, at the time these cases were determined, the Court of Errors, by which they were determined, was composed of the members of the legislative council, who are chosen annually by the freemen of the state; but it is also true that many of them were, at that time, eminent and respectable lawyers.
In the state of New York, in the case of Vandenhouvel vs. The United Insurance Company, (37) this question came directly before the Supreme Court. It was an action on a policy of insurance on the freight of the ship Astrea, which was represented as the prop erty of the plaintiff, who was a naturalized citizen of the United, States. The ship, in the course of her voyage, was captured by a British frigate, carried into Gibraltar, and there condemned, “ as belonging, at the time of her capture, to Spain, or to persons being the subjects of the king of Spain, or inhabiting within the territories of the king of Spain, enemies of the king of Great Britain.” All the learned judges who gave their opinions — Kent, Radcliff, and Benson — agreed that this sentence ought to be deemed conclusive evidence, to falsify the representation, that the property belonged to the plaintiff; and this upon the ground of * what [ * 298 ] was the English law upon the subject at the time of the revolution.
It is true that this judgment was reversed by the Court of Errors. But when I consider the character of the judges of the two courts, — -he first composed of grave, respectable, and learned lawyers, and -he second constituted by popular elections, — I derive, at least, as much satisfaction from the unanimity of the former, the result of their laborious investigation, as from the opposing decision of the latter. It can hardly be supposed that the reversal of a judgment so rendered can be considered as finally deciding, in that state, this important question.
In the great commercial state of Pennsylvania, it has been determined that the sentence of a foreign Court of Admiralty, con *244 derailing property as prize, is conclusive, not only as to its direct effects, but also as to the facts directly decided by it.
It is true that, in the case of Calhorn vs. The Insurance Company of Pennsylvania, (38) it was hot necessary that the question should be determined, and it was not determined expressly ; but from what Yates, J., says, it is evident what the law, upon that point, was then understood to be in that state. He observes that, “ The courts having adopted the English doctrine, that the sentences of foreign courts were conclusive, as to the points which they professed to decide, it was judged necessary to introduce words similar to the present into the policies.” The words here referred to were the cause of the great question in that case.
The reason why the court, in the case last referred to, cautiously avoided expressing an opinion on the question now under consideration, was probably because the same question was then under the consideration of the high Court of Errors and Appeals in that state, in the case of Dempsey vs. The same insurance company. This was an action of covenant on a policy on goods warranted American property. They were condemned in the Court of Admi- [ * 299 ] ralty, * as belonging to the enemies of the crown of Great Britain.
The cause was tried in bank, before the Supreme Court. On the trial, the' sentence of condemnation was produced, and thereupon the plaintiff offered to prove that the property was American. The evidence was rejected, and thereupon a bill of exceptions was tendered and allowed, and a writ of error brought ; the result of which was, that the judgment of the Supreme Court' was affirmed by the opinion of five judges against one ; they being of opinion, that “ the sentence óf a foreign Court of Admiralty, condemning property as prize, is conclusive, not only as to its direct effects, but also as to the facts directly decided by it.” Thus, in Pennsylvania, as well the Supreme Court as the high Court of Errors and Appeals, are as nearly as possible, without being absolutely so, unanimous upon this question. What has been stated is all the light which can be obtained upon this subject, from the decisions of the state courts.
In the Supreme Court of the United States, in the case of Groudson & Al. vs. Leonard, (39) it has been determined, by the opinion of four judges against two, that the sentence of a foreign Court of Admiralty condemning a vessel for a breach of blockade, is conclusive evidence of that fact, in an action on a policy of insurance *245 If this decision is to be considered as an authority in the national courts, (and I think it will,) it would be with extreme reluctance that I should feel myself bound to dissent from it, by prescribing a different rule for the administration of justice in the courts of the state. There seems to be a peculiar propriety in respecting the decisions of the Supreme Court of the United States upon this subject; because there is delegated to the national government an authority to regulate commerce, and because it is highly interesting to commerce, that the same rule of decision, in this respect, should pervade the whole country. It would, indeed, be inconvenient, embarrassing, and disreputable, * that, in different [ * 300 ] actions, depending, at the same time, in the national and state courts, brought on the same policy, and governed by the same facts, contrary judgments should be rendered ; and this might be the case, if different rules of decision were adopted by them respectively.
On the whole, I am of opinion that, previous to the revolution, it was an established and known rule of English law, that, in an action on a policy of insurance, a sentence of a foreign Court of Admiralty was conclusive evidence of every thing clearly and pertinently expressed in it; and I am inclined to believe that, if the question were now res integra, such ought to be deemed the meaning of the contract. (40)

Per Curiam, New trial ordered.

 1 Amb. 762.

 Cro. Eliz. 788.

 2 Wils. 23.

 4 Co. 29. — Moor. 169, S. C

 2 Stra. 961.

 Kenne's Case, Cro. Jac. 186. — Harg. Law Tracts, 456, in not. — 2 Str. 960.

 Harg. Law Tracts, 452.

 11 State Trials, 201, &c

 Vide 1 L. Raym. 262, The King vs. Raines. —12 Mod. 136, S. C. — 1 Str. 181 Rex vs. Vincent & Al. — Ibid. 703, Rex vs. Rhodes.

 2 Lev. 14, Rex vs. New College in Oxford. — Moore, 781. — 1 Freem. 83.— 5 Co. 1.

 2 W. Black. 977.

 2 Shaw, 232. — Sir T. Raym. 473, S. C.

 Comb. 120. — 3 Mod. 194, S. C. — 1 Shaw. 6, S. C. — Holt, 47, S. C.

 2 H. Black. 410.

 1 Vern. 21.

 Vide Com. Dig. Admiralty, E., and the authorities there cited.

 2 L. Raym. 893.

 Ibid. 935.

 Com. Dig. Admiralty, E.

 Vol. ii. 455.

 N. P. 240 — 244

. Page 37.

 Park. 177

 Doug. 554.

 8 D. & E. 196.

 Vide Doug. 572, Le Caux vs. Eden.— Ibid. 591, Lindo vs. Rodney. — Ibid 598, Mitchell vs. Rodney. — 2 D. & E. 649, Ladbrook vs. Crickett. — 4 D. & E. 382, Lord Camden vs. Home. — 8 D. & E. Garrels vs. Kensington. — Ibid. 434, Pollard vs. Bell. — 7 D. & E. 681, Geyer vs. Aguilar. — 8 D. & E. 562, Bird vs. Appleton. — Park 359, Barzillay vs. Lewis. — Ibid. 362, Saloucci vs. Woodmass. — 1 East, 663, Price vs Bell — 3 Bos. & Pul. 201, Baring vs. Claget.

 3 Bos. & Pul. 499.

 Day's Cases in Error, 142

 Day's Cases in Error, 170.

 New York Cases in Error, 217.

 1 Binney’s Reports, 293.

 4 Cranch's Reports, 434.

 [Croudson vs. Leonard, 4 Cranch, 434. — Brown vs. Unit. Ins. Co., 4 Dall. 179. — 1 Dall. 142. — Starkie vs. Woodward, 1 N. & M'Cord, 329, note.— Groving vs. United Ins. Co., 1 N. & M’Cord, 537. — Drewton vs. Wells, 1 N. & M’Cord, 409.— Campbell vs. Williams, 2 Bay. 27 — Curcullu vs. Louisiana Ins. Co., 5 Martin N. S. 464. — Blanque vs. Peytavin, 4 Mart. N. S. 458. — Zeno vs. Louisiana Ins. Co., 2 Miller, 533.— Grey vs. Swan, 1 Har & J. 142. — Dempsey vs. Pennsylvania Ins. Co., 1 Binn. 299, note. — See New York Fire Ins. Co. vs. De Wolf, 2 Cowen, 56. — Ocean Ins. Co. vs. Francis, 2 Wend. 64. — Radcliffe vs. United Ins Co., 9 Johns. 277.— Bourke vs. Granbury, 1 Gilmer, 16. — Ed.]