Catron, Judge,
(dissentiente.) By the act of 1782, cli. 3, sec. (?, North Carolina, byway of donation to heroffi-cers and soldiers of the continental line, in the war of the revolution, promised to each officer and soldier a certain quantity of land, as a gratuity fob the bravery, zeal and perseverance of such officer and soldier, 'in the service he was and had been engaged. In the next year 1783, ch. 3, an office was opened in which the appropriated lands might be located and grants obtained. In 1789, ch. 3, North Carolina ceded to the United States, her western, vacant and unappropriated lands, reserving the power of granting so much thereof as was due to the officers and soldiers, as also such quantities of lands as were due to the individuals who had entered for money. In 1796, Tennessee was formed into a State and in 1801, assumed the power of perfecting titles to lands, lying within her limits, due to the North Carolina claimants, which assumption of power was resisted by North Carolina. A controversy arose on the subject between the two States, which in 1804, ch. 14, was compromised between them, and Tennessee urns vested with the power to issue grants to the claimants under North Carolina. By this compact North Carolina reserved the exclusive right to issue military warrants. One of the conditions of the agreement was, that the assent of Congress should be obtained thereto. In April 1806, ch. 10, the assent of Congress was obtained, there not being land sufficient to satisfy the claims, in the original, military reservation, Congress from time to time appropriated other portions of the territory ceded by the act of 1789, for their satisfaction.
Pursuant to the power reserved, by the act of 1804 North Carolina continued to legislate upon the subject of issuing military warrants. Previous to 1819, the Secretary of State was the officer who passed upon the validity of the claim of the officer or soldier, his heir or as-signee, and issued the warrant, acting both in a judicial and ministerial capacity. In this year, 1819, December 24th, the , legislature of North Carolina, resolved, “tha^ *341 the Secretary of State make out a list of the names'of all persons who,j¡from the muster rolls in his office, appear to be entitled to land warrants for military service, aud to whom warrants have not already issued, and cause the said list to be published in one or more newspapers, printed in the city of Raleigh, for the space of two months. On the next day, 25th December 1819, the legislature passed an act appointing the Governor, the public Treasurer and Comptroller of the State, commissioners, with full power and authority, to hear and determine all applications which might be made for military land warrants — and says the act: “Their directions in writing, or the direction in writing of a majority of them, shall authorize the Secretary of State to issue a warrant for such quantity of land, as they or a majority of them may certify to be due to each applicant.” The commissioners were bound by the rame rules of evidence, which had previously governed the Secretary of State. By the act of 1807, ch.the Secretary was prohibited from issuing any military warrant without a special resolution of the legislature, unless the applicant’s name was upon the muster rolls, and he appeared to be fairly entitled to the warrant — the muster rolls being the only evidence of service — and these matters of record, the extraneous facts tobe inquired into were: 1st, the identity of the claimant, — whether the person applying was the same whose name appeared upon the muster rolls: or, 2d, his heir: or 3d, his assignee. A claim by heirship, of course involved the inquiry, whether the soldier whose name appeared upon the rolls, was dead. The proof of the death, as well as the relation of heir to the deceased, rested upon the applicant. The act of 1811 had declared what proof should be competent to establish the above facts, (to wit) — the deposition of at least one witness, showing that he who applies for the warrant, is the person entitled thereto, which shall be certified by two justices of the peace, that the deponent is entitled to credit, and the certificate of the clerk of the court pleas and quarter sessions of the county where the justices reside, certifying that they are acting justices, with *342 the seal of the court annexed. The act further provides that, thereafter, it should not be lawful for the Secretary of State to issue any military land warrant, except under the foregoing restrictions.
By an act passed by the legislature of North Carolina in December 1789, cli. 21, sec. 2, it is provided: that all theproperty that had theretofore, or should, thereafter, es-cheat to the state, should be, and was thereby vested in the trustees of the University of N. Carolina for the use and benefitof said University. By virtue of this act,the trustees of the University applied to the Board of Commissioners, for the warrant in controversy, alleging that David Ivey, whose name appeared upon the muster rolls, had died without lawful heirs, by reason of which, his aforesaid claim, escheated to the state of North Carolina, and by the act of 1789, c. 21, was assigned to them in trust for the benefit of the University. The commissioners find that Ivey was entitled to 154 acres of land for his services; — that he died in the service of the United States, or since the close of the war, without issue or heir; — that his real estate became thereby escheated, and belonged to ' the president and trustees of the University aforesaid, to whom they ordered the lands to be laid off and granted. This appears from the face of the warrant i.tself; and it is the only record evidence introduced by the complainant. The only other proofs adduced to this court are, the depositions of David Passmore and John McCallister, who state that David Ivey, the complainant, did serve in the North Carolina Continental line, in the revolutionary war, and was part of the time employed as a drummer — ■ setting forth the commands to which he belonged, and the time he served.
We are called upon to decide this cause: — 1st. Upon the facts found by the commissioners; — 2d. Upon extrinsic evidence, never submitted to them. The hearing of new proofs is in direct violation of the statutes of N. Carolina, which require that it should have been adduced to the commissioners, when the parol and record evidence could have been compared. Different men by the name *343 of Ivey, may have served in the North Carolina line;— how the fact is, we do not, nor can we know. Equally are we in the dark, whether any service, or what service was performed by the complainant — of this fact the muster roll is the only competent evidence. Parol proof, save as to identity, is wholly inadmissible, because it is neither the best evidence, or, the evidence required by the laws of North Carolina, to establish the fact of service. This bill and proof involve a dilemma. We are called upon to admit as true, so much of the record of the commissioners as awards the warrant, but to declare it false for so much as adjudges the ownership. This suit in equity is a direct bill of review of part of the decree of a court of North Carolina, that has professed to settle the rights of the parties. North Carolina stands in relation to Tennessee, as does every other independent power.— But for our confederacy of States, the reversal or disregard of the judgments of her courts, would be a cause of war, because an attack upon the exercise of sovereign power. A similar line of conduct on our part in reference to England or France, would be so, beyond controversy. Hughes vs. Cornelius 2 Show. 232, was decided in the reign of Charles II recognizing this principle in the broadest terms — the ruléis as old as international law.— That which has been decided by a foreign court, having jurisdiction over the subject matter, is conclusive, be the adjudication right or wrong. Perpetual conflict and wars would be the inevitable result of a different policy — hence, this cannot be sustained as a bill of review. The bill and proofs admit the power and jurisdiction of the commissioners, to issue the warrant to the soldier, his heir or assignee; and the warrant is introduced as conclusive evidence of the prominent fact of service. Are notthe.other facts found, together with the judgment pronounced upon them, equally conclusive?
Much argument and learning have been employed upon the head of escheat — admitting for the sake of argument that the soldier had died without heir — it is contended on part of the complainant that a claim for a land warrant is *344 not a subject of property that could escheat — the reverse is urged on the other side with equal confidence. The seems to me tobe of no importance in. the cause— the decision must be the same, be it the one way or the other. If the claim did not escheat, and was not vested in the University as assignee of North Carolina by virtue of the act of 1789, ch. 21, then by the cession act of 1783 ch. 3, the property of North Carolina to the western lands was transferred to the United States, discharged of the deceased soldier’s claim, because in all cases where the soldier had died without heirs before the cession of 1789, the claim was extinct against North Carolina, the United States took the ceded territory disencumbered of it, and North Carolina had no power to issue any warrant tor such extinct claim — she only reserved power by the cession act, to perfect titles to the officers and soldiers, their heirs and assigns [or claims then out standing against her; cave these, and North Carolina parted with all title and claim to the soil and sovereignty to the country ceded.— The act did not take effect until April 1790, when it was ratified, and the cession with its condition accepted by Congress. In 1789, was passed the act of assigning to the University, all property that had, or might escheat to North Carolina. This warrant was adjudged to the University, no doubt upon the ground that the claim had escheated before 1789.
The object of the bill is, that this court decree to the complainant the land entered or compensation therefor from the defendant. Taking, then, to be true what the argument claims, that the claim for the warrant could not and did not escheat on the death of the soldier without heirs, it results as has been shown, that no obligation rested upon North Carolina to issue the warrant to the University, which corporation took no title under the act of 1789, ch. 21. That that State transferred her western territory to the United States, subject only to the existing claims of her officers and soldiers, their heirs and assigns, without reserving poiver to appropriate any part of the ceded territory on the pretence of claims having cschea- *345 ted to her, and which had been assigned to the University before the cession. That for want of power to issue the warrant, the same and the entry grounded thereon are void, as if North Carolinahad caused to be entered thelands of the United States in Mississippi or Missouri. If so, Pinson took no title by his entry, and the land now in controversy belongs to the United States. Such is, unquestionably $ the legal consequence resulting from this agreement.— Pinson, not having acquired any title to the land, has nothing to be decreed from him. To decree the lands to. complainant as prayed for, would be an attempt to appropriate the lands of the United States by this court — and by an assumed power, to despoil the public of her domain. The claim to make Pinson pay damages, when no benefit has accrued to him, would be equally untenable.
'. The fact, however, is, in the present controversy, that both the complainant and defendant are obliged to rest their respective claims upon the power of the commissioners to issue the warrant in its present form, because the warrant must be legal and valid, and authorize a grant to be issued thereon to the defendant, otherwise the Complainant has no right to call upon him for the benefit thereof in a court of equity. Whether a claim to a land warrant could or could not escheat to North Carolina, I will not pretend to determine, — such decision not being necessary to dispose of the present cause.
This inquiry brings us directly in conflict with the judgment of the commissioners which awarded the warrant to the University. Without stopping to examine whether the foregoing evidence is sufficient to authorize the court to revise the order made by the commissioners, we will first enquire whether it has the power to revise the decision of that tribunal; for, that a decree of this court, adjudging the warrant to the complainant, would be a' reversal, none can deny. That this in effect is a con- ■ troversy between North Carolina and the complainant, is admitted on both sides.
North Carolina says by her counsel: 1st, WA decree *346 for the complainant would be an- attack upon her. sovereign and, therefore, cannot be admitted.
2d. That the judgment of her commissioners is conclusive andan estoppel to this and every other judicial tribunal, attempting to inquire into and impeach that judgment. That North Carolina had the power to institute the commission will be taken for granted — nine tenths of our landed titles have originated in similar adjudications to the one now under consideration-still, the power of the legislature to institute the commission has never been called in question.
That tlie adjudication is binding upon the State of. North Carolina, and the successful applicant for the warrant, will also be taken as true — but did it bind ivey who was deprived of his right?
For North Carolina it is contended, that she reserved the exclusive right to issue military land warrants, that she has, and necessarily must have exercised this power in her sovereign capacity; that this was a transaction between herself and her mm citizens, with which no other power has any right to interfere, either in a legislative or judicial capacity; that by declaring the acts of her agents void, which were done ministerially, and in strict conformity with the instructions of her legislature, and transferring the military warrants to others than those she caused them to be issued to, would be doing that, indirectly, by this court, which it cannot pretend to have power to do directly, (to wit) issuing military warrants; that if North Carolina erred as a sovereign power and wronged her soldier, he is without remedy in a court of justice— as authority, to prove the position, were cited Nabob of Arcot vs. The East India company. 3 B. C. C. 292. 1 Ves. jr. 371. 4 Bro. C. C. 180. 2 Ves. jr. 56. Barclay vs. Russell, 3 Ves. 424. The cogency of this argument has struck me with great force. For the present, however, we will pass over that part of- the cause connecting itself with North Carolina, acting thro’ her agents as a sovereign power, and proceed to examine the force and effect of the adjudications of the commissioners as *347 tho’ no such question was involved. This leads us to inquire into the powers and jurisdiction of the commissioners. By the compact of 1804, North Carolina reserved the exclusive power of issuing military land warrants.— This reservation was not unreasonable,because, first,it was not practicable to adjudicate the claims of the officers and soldiers without reference to the muster rolls, and a vast mass of documents in the Secretary’s office of North Carolina. What claims had been satisfied and what not, could only be ascertained from the records of that office. 2. North Carolina had the right and it was her - duty, to see her citizens justly dealt by. To’ give effect to this power she instituted a board of commissioners of her principal officers of State who had charge of the public offices and records, who were given “full power and authority, to hear and determine all applications which might be made for military land warrants; and their direction in writing, o,r the direction of a majority of them, should authorize the Secretary of State to issue a warrant for such quantity of land, as they, or a majority of them, might certify to be due to each applicant.” Hence the board of commissioners had jurisdiction to determine upon the claims of all those applying for a military land warrant, whether in the character of original claimant, heir or assignee; nor could in the nature of things, notice be given to the claimant adverse to the applicant, other than the publication of the list of names of those to whom warrants had not issued, together with the act constituting the board. Its proceedings related to a matter ,of a public nature. The board was organized to hear and determine between the State and the claimant.— It rested upon the latter to apply to this tribunal for-án adjustment and allowance, or rejection of his claim; the proceedings were,as a matter of necessity, conducted in the nature of proceedings in rem — all those who had claims for military warrants against the State, being deemed cognizant of the judgments and orders of the board, notwithstanding they had no direct personal notice. It is a rule of international law, in proceedings affecting the *348 public as well as in cases of a local and municipal nature, generally, where the government is a party, that decisions are made affecting the rights to property without personal notice having been given to those interested in the event— no better instance, to establish the necessity of which rule, is remembered than the present. North Carolina, with the most affectionate and paternal care, had urged her officers and soldiers to come forward, prove their identity, and receive their lands: she passed acts of limitation to applications, but, before the time expired and the bar was formed, she repealed them and gave further time — manifesting a most praiseworthy patience and forbearance, still without effect, to an embarrassing extent. Most of the soldiers had fallen during the war, or, by the course of nature, since; — many had assigned away their claims; who the heirs or assignees were, was unknown.— To have issued the warrant, as was suggested in argument, in the name of the deceased soldier, and granted the land in his name would have been'void for want of a grantee; the act of 1779, ch. 14, not extending to such a case would have given rise to innumerable law suits, between original claimants and assignees, — heirs and assignees — and different persons, claiming the same warrant as heirs,had a title vested, and would have manifested a want of caution in the government. Furthermore, by the cession act, Congress had agreed that if there were not a sufficiency of good land within the military district to satisfy the military claims, other lands of good quality should be furnished for the purpose within the ceded territory and without the military boundary. To comply with this provision it was absolutely necessary that the military claims should be located within the shortest convenient time, by which the fact might be known whether any, and if any, what lands remained to the United States as a common fund. If revenue were to arise from the surplus lands, the government had a right to expect it at a day much short of forty years — as a matter of policy, she had a right to hope that her western forest would be parcelled out and populated by such- numbers as could *349 suppress her savage foes, and who would add to the, pow-Or and wealth of the nation by successful culturé of a portion of her most fertile soil. These objects, with many moré of the highest.political consideration, show the imposing necessity that rested upon North Carolina to cause her military warrants to ,be issued and located. Good policy, duty to the United States, to Tennessee, and, most of all, to herself, left North Carolina no alternative hut to proceed to issue these warrants, acting with as even handed justice towards her soldiers, as the nature of the case would admit.
To the course pursued, there can be no reasonable objection. Proceedings in rem operating upon the property claimed without notice to adverse claimants, are had in prize courts in all civilized Countries; the same course is pursued in the English court of Exchequer, in cases of forfeitures for treasons, felonies, or a violation of the revenue laws. Proceedings are had in the nature of proceedings in rem, and without notice, in courts admitting wills to probate and granting administration, and the expectancies of heirs and distributees, swept away when the weakness of infancy, or residence in a foreign land should, seemingly, protect them, because of the perma. nent, political consideration, that the rights of property thus situated should be sp'eedily settled by a legal ascertainment of them. All of which adjudications are dictated by public policy and necessity, regardless to some extent, of private rights.
For similar reasons, this course is pursued in the collection of revenue, where the daily practice is to render up judgment and dispose of property for taxes without notice to the owner. Where a proceeding has been had and an adjudication made, in any of the courts above referred to, altho’ in rem or in the nature of a proceeding in rem and without notice — still, whenever the judgment is drawn in question in. another action affecting the same property or subject matter, the only inquiry that can be made in the second action is, had the court, rendering the first judgment, jurisdiction over the subject matter and *350 did it decide the same? If the first tribunal had jurisdiction and has passed judgment, then, such sentence or decree is conclusive and final upon all interested, and estops all other courts or tribunals before which, is attempted to be litigated, the same matter. The facts found by the first tribunal, which were necessary to the formation of the sentence pronounced, are also conclusive of the- existence of such facts and can never be the subject of inquiry upon a subsequent investigation in another tribunal, more, than the sentence itself.
Some of the English authorities going to confirm this principle, pronounced, somebefore and some since the A-meriean revolution, will be found in Starkie’s evidence, 1 vol. 98, sec. 73, 185, pt. 2, sec. 57, 228, sec. 77, 231, sec. 78, 79;, 80. Hughes vs. Cornelius, 2 Show 232. 8 T. R. 196. 2 Evan’s Pothier 353. ’This course of decision has been fully recognized in the United States, as will be seen in 3 Cranch 458. 4 Cra. 185, 434. 3 Wheat. 246 to 315. 6 Mass. Rep. 277. The above authorities refer to the sentences of prize courts and other admiralty proceedings,but the same rule applies to the judgments of the spiritual courts and tribunals receiving the probate of wills &c. 1 Stark. Ev. 231,. sec. 78. To orders of justices of the peace in the [cases of roads, ferries and bridges where private property is affected thereby — to the r.émoval of paupers &c. 1 Salk. 396. 1 Brod. and B. Rep. 57.
So condemnations of commissioners of excise are conclusive, 'where there has been a breach of the revenue laws. 2 Evan’s Pothier 353. 5 T. R. 255. 1 Hargrave’s Law Tracts 168, n. 1. 1 Stark. Ev. 237. These principles were admitted to be settled beyond doubt, by the counsel for the complainant in his argument, in cases rvhere applied to judicial proceedings, but it was contended that the commission instituted by North Carolina to issue military land warrants, did not act in a judicial but merely a ministerial capacity, and that the foregoing rule did not apply to executive proceedings — to support which position, 5 Johns. C. Rep. 44-, Arden vs. Patterson, *351 was relied upon. It is believed the counsel was mistaken in supposing the commissioners acted only in a ministerial capacity, when they ordered the warrant to he issued to the University. North Carolina having reserved the power to issue grants to her officers and soldiers, their heirs and assigns, the person to whom the land was due had the right of electing its locality — for the purpose of making the location it was necessary, that to him the warrant should be delivered; and that he might obtain the .grant, it was proper the warrant should issue in the name of the true owner, tho’ he might be an heir or as-signee of him who performed the service. To ascertain to whom the claim belonged at the time of the issuance of the warrant, was the duty of North Carolina. Principally, for this purpose was the board of commissioners instituted — to establish the ownership it was necessary that certain facts should be proven ' to the satisfaction of that tribunal — if the soldier in person applied, it rested upon him to prove his identity; if the heir applied, it rested upon him to prove the identity of the ancestor, and. the relation of the applicant as heir; if the assignee applied, it rested upon him to prove the identity of the as-signee, and that the assignment was actually made by him who performed the service. The character of the evidence necessary to establish these facts, is pointed out by the acts of 1811, together with the mode of authentication. Upon the depositions being filed, the commissioners proceeded to an investigation of the claim upon the facts proven by the records in the Secretary’s office, and by the deposition, if well founded, they ordered, in writing, the Secretary of State, to issue the warrant to the applicant. So far as the commissioners acted at all, their acts were exclusively of ajudicial character; and, if the or-' der made by them was within the powers conferred, it is entitled to all the respect due to the judgments o 1 other courts acting within their jurisdiction. The commissioners clearly acted within their jurisdiction and found every fact necessary to.bring them to the conclusion that the warrant, of rights should issue to the University.
*352 Had this court the power to alter or reverse the decision of the commissioners, still to my mind there is no proof that the warrant in controversy issued for the services proved to have been performed by the complainant. There is no proof that David Ivey’s name iippears upon the muster rolls of the commands to which the witnesses (Passmore and M’Callister) testify he belonged. For what particular service the warrant in controversy was issued, we do not know and can only know by an inspection of the muster rolls or, a copy of them. If we are called upon to reverse the decree of the commissioners, we should at least have before us, the same evidence of claim they had. Loose parol proof of service, aside from the record evidence offered by the muster rolls, would have been wholly insufficient to procure the warrant, had it been adduced to the board of commissioners in North Carolina; nor can it have any greater effect here.
What would be the consequence of an assumption of power on the part of the courts of Tennessee, to review and' reverse the decisions of the board of commissioners — and this upon new proof — parol evidence of the most slight and unsatisfactory kind, proceeding in utter ignorance of the record evidence upon which the board ordered the warrant to be issued? The answer is obvious and appalling! not only this small, warrant, but every one issued by the Secretary and commissioners for military services-, would'be subject to the same judicial teste. Hundreds, perhaps, thousands of claims would be set up, overwhelming our courts with litigation and destroying.all confidence in military titles, at least, in the Western District. He who performed the service or his heirs, would sue the assignee, prove the service by parol, as in this case, and force the defendant into a new investigation of the validity of the assignment, the evidence of which had long been forgotten or was lost; — the warrant having passed through a dozen or fifty hands. Ninety-nine of every hundred military warrants have issued to assignees; the assignments have been passed upon and pronounced valid *353 í>y the officers of North Carolina and Tennessee. The rights of heirs and original claimants have been equally investigated and settled. Is this to pass for nothing? — North Carolina reserved the exclusive right to issue military warrants to original claimants, to heirs and to assignees. In her sovereign capacity, did she reserve this 'exclusive right? Is it not mockery to conclude this,- and at the same time, assume the power to defeat it at pleasure, by ordering the grant to issue to any person we may deem entitled? — and upon proof that, in North Carolina, could not and would not have been heard, if produced to the proper tribunal and in due time. That such is the construction of the act of 1804, chi 14, I cannot believe. By compact we left it to North Carolina to deal with our own citizens — if she has dealt unjustly, we reserved no remedy for their relief, and should firmly do our duty without reference to our sympathies. The legal title to the entry of the land in controversy rests in the United States; by the: cession act of 1789, North Carolina reserved the power to grant it in satisfaction of the warrant. By the act of 1804, Tennessee was deputed to execute the grant to the enteren Neither the United States, North Carolina or. Tennessee are before the court — they cannot be sued.— We have ho power to coerce Tennessee to make the grant to the complainant. We have no power to divest the legal title out of the United States and vest it in complainant by force of the act of 1801, ch. 6, sec. 48. The idea of treating North Carolina as a trustee, holding a legal title, which she had covenanted to grant, and coercing her, the same as we would an individual, to specifically execute a contract with David Ivey, presents itself to my mind as a novel assumption of jurisdiction; we have no judicial means by attachment, or otherwise to enforce obedience to such a decree.
We have been referred to the opinion of the Supreme Court of the U. States in the case of Comeyges and others vs. Vasse, 1 Pet. Rep. 201, as deciding the principle “that the order of the commissioners of North Carolina', was not binding upon the right of litigant parties before this *354 court.” That cause arose upon a claim to the money acyU(jge¿[ jje due from Spain to American citizens, un-treaty of 1819, between Spain and the United States. The latter government agreed with the former, in consideration of the cession of the Floridas to us, that ' we would pay to American citizens a sum not exceeding five millions of dollars, for and on behalf of Spain for property unlawfully seised and condemned by that power. — ■ By the 11th article of the treaty, the President of the United States was authorized to appoint three commissioners to ascertain the claims against Spain, and certify their respective amounts to the treasury department of the United States for payment. As to the validity of the claim against Spain and its true amount, the judgment of the commissioners was conclusive, but they had no power to try the question of private right between the two adverse claimants to the property — this was left to the ordinary judicial tribunals. Such is the decision referred to upon the construction of the treaty, which is too plain to be susceptible of a doubt upon the point of jurisdiction, aside from any adjudication.
Far different were the duties of the North Carolina commissioners, from those under the Spanish treaty.— The latter fixed the validity and amount of the claim and there left it. This was certain in the instance of a land warrant — the muster rolls had fixed it beyond controversy — they were conclusive upon the validity and amount of the claim — the main business of the commissioners was, to ascertain the identity. of the individual entitled, from proofs extrinsic of the record. The prime object of instituting the board was, to ascertain the precise fact now drawn in controversy before this court, (to wit) who was the proper person, in whose name the warrant should be issued and the land granted.
Remarks have been made in argument reflecting upon the conduct of the legislature of North Carolina and her commissioners for having issued this and similar warrants. In this instance, at least, there is not believed to be any good grounds for the aspersion. That it long has been *355 the opinion of courts and judicial men in North Carolina, “that every claim to property ,falling to the sovereign power for want of an owner” is the subject of escheat, by virtue of the act of 1789, ch 21, we well know, 2 Hayw. Rep. 108, Gilman vs. Kay. That the commissioners decided this legal point in favor of the University, from honest convictions and worthy motives, ought not to be doubted by any lawyer or judge of Tennessee. Two of our ablest lawyers concurred in this opinion, as will be seen by our compact with the trustees of the University, made in 1822, ch. 3, who were specially appointed by the legislature of Tennessee to inyestigate the title of the University, to this description of warrants — and with which opinion our legislature concurred. Be this as it may, a tribunal of North Carolina has given a construction to one of her local laws, by a decision which it is belieyed this court has no right to disturb. To do so, would be claiming a most unseemly exemption from fallibility on our part, in violation of the international rule accorded to every independent State — “That the local tribunals are the best judges of the construction, and application of its own laws.”
As little exception can be taken to the integrity of the decision of the commissioners upon the facts; — two facts, extrinsic of the record were found by them: 1. That David Ivey was dead: 2. That he died without heirs.
1. David Ivey had not been heard of in North Carolina, as must be inferred from his own statement in the bill, taken in connexion with the statement made in the warrant, for nearly forty years. No better evidence from which his death might be presumed could be desired— seven years would have been sufficient to raise the presumption, 2 Stark. Ev. 457. 2. The circumstances of his family, and relation to others was a matter of proof, which we must suppose was made — perhaps, it was presumed. No heir had appeared to claim the warrant for nearly forty years; hence the conclusion was very reasonable, that David Ivey had died without heirs.
The whole facts upon which the commissioners ground *356 ed their decision, favorable to the University, .we do not know, andaré estopped, to inquire; hat from what does appear, no blame can attach to them. The complainant tells us in his bill that he never applied for his warrant; never made the least exertion of any kind to obtain it; that he had Jong since removed froih North Carolina and relied upon that government to grant him his land without any act on his part, and offers his age, poverty and residence at a distance, as his excuse. Twenty or thirty years since, he may have been young, had propertj1-, and resided in North Carolina — still, he slept upon his rights, and should not, at this day, attach blame to the acts of others, that were the consequence of his own negligence, in not asserting his claim as presented by the statutes of that State. If relief is desired the government of North Carolina must be applied to for it, for want of power in a court of chancery in this State to afford any.
I, therefore, think the opinion of the chancellor should he reversed and the bill dismissed,
Upon the re-argument had in this suit,
Judge Catron
delivered the following opinion:
Ivey vs. Pinson. This cause has again, been carefully and extensively argued; and upon no ground assumed, do I think a decree can be made for complainant. 1 differ from my brother judges in opinion, and feel it due to them and myself, briefly to state the main grounds of difference, and will add to the opinion heretofore read — that up to 1789, North Carolina had the undoubted power to constitute any description of tribunal to adjudge upon the claims of those applying for military land warrants, and to cause them to be issued to the soldier, his heir or as-signee, and to make grants thereon, to whomsoever she saw proper.
By the compact of 1789, she parted with none of her powers in reference to military land claims — she could issue warrants and cause the lands to be granted, as before 1789. In 1804 North Carolina deputed Tennessee as her *357 agent to cause the lands to be located and granted. But she reserved the power to issue the military warrants— she reserved all the power of legislation, erecting nals, and conferring powers upon them to adjudge of the rights of claimants to military warrants, that she ever had.
It is said before 1819, North Carolina had always issued the warrants in the name of him who performed the service. It seems immaterial to me what the practice had been — she reserved the right to issue the warrant, and grant the land to the soldier, his heir or assignee, by the cession act. If she saw proper in 1819, to canse warrants to issue and grants to be made out to the living owners, instead of dead men, she acted within her powers and wisely.
A grant in the name of a deceased soldier would be void for want of a grantee by the common law. The act of North Carolina of 1779, ch. 4, sec. 4, provides, that where a man had made or should make an entry of land and had died, or should die before the grant issued, the same might be made out in the name of the deceased en-terer, and the fee, by virtue of the grant, should vest in his heir or assignee. The act refers to a vested right to a particular spot of land, elected and located of record by the true owner of the warrant, when entered and the proper person to make the election, — -a legal title to many purposes. But the act can have no application to a case where the soldier had died without heirs, and no warrant had ever issued to him. The issuing of warrants and causing entries and grants to be made out in form, in the name of dead men, without heirs or assignees would have been a proceeding, novel in its character, void by all known rules of law, and an idle waste of time and labor on the part of North Carolina and her commissioners.
The board was mainly instituted to examine the University’s claims, and to say it had no powers to perform the objects of its creation, would beastrange construction of the act of 1819, using terms as apt as any in our language to confer the powers exercised. I think the cómmis- *358 sioners clearly had powers of a judicial character, every way competent to issue the warrant to the University. If so it is admitted onall hands, that their adjudication is con-elusive. The'commissioners either had or had not power to issue the warrant in controversy. If they had, it is conclusive, and the bill must be dismissed — if they had not, it is void. Pinson can take no interest by virtue thereof, has nothing to decree from him, and the bill must be dismissed.
My brother judges are of opinion these warrants could not lawfully issue to the University, on the foot of es-cheat, because the claim was not the subject of escheat: that the commissioners had no power or jurisdiction to order this land to be laid off and granted to the University, in consideration of the military services of David Ivey; that doing so was an excess of jurisdiction and void as to the University — but that the recital on the face of the warrant is evidence of the right of David Ivey. Upon these premises we have come to different conclusions.— North Carolina reserved the right to issue the warrant— on this alone, can Tennessee cause the land to be entered and granted. What is the warrant? an order to our officers — “that you lay off and grant to the University 154 acres of land.” Can our officers issue a grant to Ivey on the recital? If the warrant is void as to the University, it is as a blank piece of paper. It is said it shows the faetthat D. Ivey performed the service; granted — but does it direct Tennesse to issue to him the grant? Certainly not. Can we issue a grant without a warrant? We cannot. If it be true that the soldier’s claim did not escheat, and was not assigned by the act of 1789, ch. 21, and that the commissioners had no power or jurisdiction to issue the warrants to the University; then the entry of Pinson is void beyond doubt, as is every entry and grant, made by virtue of warrants issued to the University, and the title to the lands they cover in the United States — why? because the University had no right to a warrant and Tennessee no power to issue a grant, but on a North Carolina warrant, authorized by the cession act. These, it is *359 declared, were wholly unauthorized. On this warrant the entry was made, on this warrant the grant must issue— it shows all the facts conclusive of its invalidity on its face — why, then, should our officers obey its mandate and cause it to be surveyed and granted?
If Pinson acquired no right to the soil by virtue of his entry, he has nothing to he decreed from him, and the bill must he dismissed. How can Ivey be injured? North Carolina was hound to grant to him 154 acres of land: she grants the land to the University, professing to be in discharge of the claim.. This is no discharge of the claim due to Ivey. Suppose A covenanted with B to convey to him 154 acres of land, out of five millions of acres, the tract to be elected by B, A conveyed to him. Then B applied and it appeared C had obtained this conveyance from A. fraudulently — would not A be still, and equally bound to discharge B’s. covenant? Could B file a bill against C and cause him to convey the lands fraudulently obtained from A1 It is believed clearly not. B had neither been defrauded or sustained damage — both must concur to authorize a recovery in damages, or specially. If A submitted to the loss, it would not be in the mouth of B to redress his wrongs.
1 will here state what I did not in any original opinion, on the subject of escheats. By the acts of"1782 and 1783 the soldier had a vested right to the land, due him from North Carolina. The cession act is good evidence of the fact. It was unequitable claim upon the government which could not be legally enforced against a sovereign State, in whom the fee rested to the body of the land in which the soldier was bound to elect it, according to the prescribed forms of law. This vested right reverted to the state on the death of the soldier without heirs — the equitable claim was extinguished, and North Carolina held the fee discharged of it — I speak of deaths accruing before 1789. These claims, “falling to the state for want of an owner’’’ — North Carolina had the undoubted right to transfer to her University as her assignee, which she did do, by her act of 1789, ch. 21, let the English common law *360 of escheat be what it may. In such cases, I have rid doubt, North Carolina reserved and had the right and power, to cause to be issued to the University as her assignee, the warrant in consideration of the services of the deceased soldier, with every legislative and judicial power to this end, she possessed before 1789. Furthermore, — that in this respect, her acts of legislation and the judicial acts of her commissioners are conclusive upon the courts of Tennessee, who have not heretofore, in a single instance, called in question this power, or its conclusiveness, when exercised. The doing so, at any time, and now, is, as I think, pregnant with the utmost mischief. If the acts of North Carolina can be enquired into in this case, the same rule will apply to every, warrant issued by that state, amounting to hundreds of thousands.
Such was the opinion of the legislature in 1822; such the opinion of the most ancient, distinguished and experienced ejectment lawyers of that day; such the conclusion I then formed, to which I have been taught many reasons for adhering.